# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **JAYCE WINGO**<br>c/o FG+G<br>50 Public Square, Ste 1900,<br>Cleveland, OH 44113,<br><br>    **Plaintiff,**<br><br>vs.<br><br>**CITY OF CHILLICOTHE,**<br>c/o Chillicothe Police Department<br>Ross County-Chillicothe Law Enforcement<br>    Center<br>28 North Paint Street<br>Chillicothe, OH 45601<br><br>**OFFICER CODY MOORE,**<br>c/o Chillicothe Police Department<br>Ross County-Chillicothe Law Enforcement<br>    Center<br>28 North Paint Street<br>Chillicothe, OH 45601<br><br>**OFFICER JEREMY CONLEY,**<br>c/o Chillicothe Police Department<br>Ross County-Chillicothe Law Enforcement<br>    Center<br>28 North Paint Street<br>Chillicothe, OH 45601<br><br>**OFFICER JON CAMPBELL,**<br>c/o Chillicothe Police Department<br>Ross County-Chillicothe Law Enforcement<br>    Center<br>28 North Paint Street<br>Chillicothe, OH 45601 | Case No.<br><br>Judge<br><br>**COMPLAINT AND JURY DEMAND** |

| | |
|---|---|
| **DEPUTY ROBERT RUSH,**<br>c/o Ross County Sheriff's Office<br>Ross County-Chillicothe Law Enforcement<br>    Center<br>28 North Paint Street<br>Chillicothe, OH 45601<br><br>      **Defendants.** | |

1. This is a civil rights action to redress Defendants Moore's, Conley's, and Rush's uses of excessive force against Jayce Wingo, an unarmed 21 year-old man who was restrained prone on the ground and posed no threat of harm at the time these Defendants used excessive force.

## JURISDICTION AND VENUE

2. The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. §1983 *et seq.*; the Judicial Code, §§1331 and 1343(a); and the Constitution of the United States. Supplemental jurisdiction over related state law claims is invoked pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this District under 28 U.S.C. §1391(b). The Parties reside, or, at the time of the events took place, resided in this judicial district, and the events giving rise to Plaintiff's claim also occurred in this judicial district.

## PARTIES

4. Plaintiff Jayce Wingo is an individual domiciled in Chillicothe, within Ross County, Ohio, which is within this judicial district.

5. Defendant City of Chillicothe is a municipal corporation, duly incorporated under the laws of the State of Ohio and located in this judicial district. Defendant City of Chillicothe was, at all times relevant to this Complaint, the employer and principal of all Chillicothe Police

Department officers, including Defendants Cody Moore and Jeremy Conley, and was responsible for the training, supervision, policies, practices, and customs of its officers.

6. Defendant Cody Moore was, at all times relevant to this Complaint, a duly appointed and on-duty City of Chillicothe police officer acting within the scope of his employment and under color of state law. He is sued in his individual capacity.

7. Defendant Jeremy Conley was, at all times relevant to this Complaint, a duly appointed and on-duty City of Chillicothe police officer acting within the scope of his employment and under color of state law. He is sued in his individual capacity.

8. Defendant Robert Rush was, at all times relevant to this Complaint, a duly appointed and on-duty Ross County Sheriff's deputy acting within the scope of his employment and under color of state law. He is sued in his individual capacity.

## FACTS

### Defendants' Use of Excessive Force Against Jayce Wingo

9. On the evening May 14, 2024, Jayce Wingo, a 21 year-old student at Ohio Christian University, was spending time with his father at his father's house.

10. At around 9:00 p.m., Jayce's 17 year-old little sister Tiana called Jayce and their father James. Tiana was crying. She told Jayce and James that she was at her mother's house, where an adult male neighbor had just hit her. Concerned for Tiana's safety and well-being, Jayce and James went to see Tiana.

11. When Jayce and James arrived, members of their families were frustrated by what they viewed as unfair decisions by law enforcement officers. Although Tiana's neighbor admitted that he threw water on her and hit or pushed her, as corroborated by the neighbor's Ring doorbell,

the responding law enforcement officers advised that they would not arrest or cite the neighbor for assaulting Tiana

12. Members of Jayce's family began to verbally argue with the City of Chillicothe police officers and Ross County Sheriff's deputies who were present, urging them that Tiana's neighbor was at fault for assaulting a minor. These disputes escalated to physical altercations in several instances.

13. At some point during these arguments between members of Jayce's family and the officers and deputies, an unknown officer or deputy pepper sprayed Jayce in the eyes, causing Jayce's vision to become blurred.

14. After Jayce had been pepper sprayed, he was standing next to Tiana when he saw someone shove her. Although Jayce's vision was blurred, he acted on instinct and adrenaline to de-escalate the altercation between this person and his little sister. He placed the person who shoved his sister in a "bear hug" to try to hold him back from Tiana. That person, unbeknownst to Jayce at the time, was Defendant Deputy Robert Rush.

15. Immediately thereafter, multiple officers and deputies physically engaged with Jayce and Defendant Rush, including by "dogpiling" onto Jayce and Defendant Rush. One officer pulled Defendant Rush forward and away from Jayce. Then other officers took Jayce to the ground, where Defendants Moore and Conley held him prone.

16. Jayce, realizing what had just happened, did not resist the officers' attempts to restrain him prone on the ground.

17. When the officers took him down, Jayce stuck out his chest to absorb the impact in his chest and torso as he struck the ground.

18. Defendants Moore and Conley then successfully restrained Jayce—who was not resisting—by holding him prone on the ground. Next, the officers went to handcuff Jayce.

19. Jayce did not resist being handcuffed. He was able to immediately make his left hand available, but the officers had pinned his right arm under his torso. When the officers yelled at him to "give up" his right arm, he responded that he was trying but could not. Shortly thereafter, Defendant Conley pulled Jayce's right arm out to be handcuffed.

20. Body-worn camera video shows that Jayce did not resist or fight back against the officers and deputies after they had taken him down and restrained him on the ground—even before they had handcuffed either of Jayce's hands.

21. But when Jayce was restrained prone and unresisting, Defendants Rush, Moore, and Conley each used unreasonable and excessive force against Jayce, causing him to sustain severe head injuries:

   a. After Jayce was successfully restrained on the ground and was not resisting, Defendant Rush delivered three "stunning blows" to Jayce's face, as Rush admitted in his report. This use of force was not self-defense because it occurred after Defendant Rush had disengaged from Jayce. Further, this use of force was not a reasonable effort to help other officers control Jayce because it occurred when Jayce was restrained and unresisting. Defendant Rush's use of force was thus retaliatory, gratuitous, unreasonable, and reckless.

   b. After Jayce was successfully restrained on the ground and was not resisting, Defendant Conley punched Jayce three times, as Conley admitted in his report. Although Defendant Conley wrote in his report that he punched Jayce because Jayce had not let go of Defendant Rush after the officers took Jayce to the ground,

body-worn camera video shows that Jayce had let go of Rush before he was taken down. Defendant Conley's use of force was not undertaken to protect Defendant Rush—it was retaliatory, gratuitous, unreasonable, and reckless.

c. After Jayce was successfully restrained on the ground and was not resisting, Defendant Moore "forced Jayce's head down against the ground," as Moore admitted in his report. Although Defendant Moore wrote in his report that he forced Jayce's head against the ground while Jayce was engaged in a physical altercation with Defendant Rush, body-worn camera video shows that Jayce's head never made contact with the ground until after he disengaged from Rush. This means Defendant Moore could only have pushed Jayce's head down against the ground after Jayce was already down. Defendant Moore's use of force was not undertaken to protect Defendant Rush—it was retaliatory, gratuitous, unreasonable, and reckless.

d. After Jayce was successfully restrained on the ground and was not resisting, Defendant Moore also lifted Jayce's upper body up and either let it drop hard onto the ground or slammed in to the ground at least twice. Upon information and belief, these uses of force caused additional impacts to Jayce's head. These uses of force were retaliatory, gratuitous, unreasonable, and reckless.

e. Defendant Moore used force directed at Jayce's head at least one additional time. As Jayce lie prone and restrained on the street, with both hands handcuffed, his head resting on the hard ground, and his body limp, Defendant Moore placed his hand on Jayce's hand and pushed down on it as Defendant Moore rose to his feet. Defendant Moore used Jayce's head as an object to help him stand up, manifesting

a callous disregard for Jayce's risk of head injuries. This use of force was retaliatory, gratuitous, unreasonable, and reckless.

22. From Jayce's perspective, after he was taken to the ground, he was shocked to feel officers striking him from all around after he was fully subdued. He particularly felt the punching impacts to his face, head, and neck.

23. After Jayce felt the punching impacts, he felt a separate impact to his head that felt like someone was slamming his head onto the ground. Upon information and belief, Defendant Moore caused this slamming impact.

24. When Jayce was taken down and restrained on the ground, he was fully conscious, responsive, and speaking to the Defendants—even after the punching impacts. But after the impact to his head that felt like someone slamming his head to the ground, Jayce began to lose consciousness.

25. When Defendant Moore and Officer Jon Campbell escorted Jayce to a cruiser, Jayce could not stand on his own because he had partially lost consciousness.

26. As Defendant Moore and Officer Jon Campbell pulled Jayce off the ground, blood could be seen on the street from Jayce's face. As they heaved his upper body onto a car, yelling at him to stand up, Jayce bled onto the car, and Defendant Moore and Officer Campbell acknowledged that Jayce was bleeding from his head.

27. Jayce was transported to Adena Regional Hospital by Emergency Medical Services.

28. Upon arrival to the emergency department at Adena Regional Hospital, EMS reported that Jayce had been unresponsive during transit. Although Jayce had regained

consciousness by the time he arrived at the Adena ED, Jayce had a Glasgow Coma Score of only 10, indicating that Jayce had sustained a moderate traumatic brain injury.

29. At the emergency room on the evening of May 14, 2024, Jayce's treating physicians observed that he had bruising and cuts on multiple injury sites: he had periorbital, supraorbital, and right frontal scalp hematomas as well as a right supraorbital laceration.

30. Jayce also later realized he had a laceration above his hairline on the left side of his face, bruising on his neck, and various bruising and abrasions on his torso and arms. These injuries demonstrated multiple injury and impact sites.

31. Jayce would later be diagnosed with a traumatic brain injury and postconcussive syndrome, as detailed further below. Based on the physical evidence presented by Jayce's injuries, it is clear that Defendants Moore, Conley, and Rush inflicted multiple uses of force upon Jayce's head.

**Defendant City of Chillicothe Failed to Properly Train its Officers Against the Use of Excessive Force Against Restrained Subjects**

32. Defendant City of Chillicothe failed to properly train its officers regarding constitutional limits upon the use of force to effectuate an arrest.

33. Defendant City of Chillicothe failed to properly train its officers regarding constitutional prohibitions against using force against restrained or subdued individuals who offered no active resistance. It was obvious that Chillicothe Police Officers would encounter such situations in their regular duties.

34. On February 26, 2024, Defendant Conley used excessive force against a man he had already subdued. Arrestee Ronald Anderson was in the backseat of a police cruiser when Defendant Conley used a taser on him. Although the taser succeeded in subduing Anderson, who was then slipping in and out of consciousness, Defendant Conley nevertheless continued to use

force against him, including by pushing Anderson against the police car cage and forcibly removing his glasses to throw them out of the car.

35. Although Chillicothe Police Department leadership had actual knowledge of Defendant Conley's February 26, 2024 use of force against a subdued arrestee who was no longer resisting, Defendant City of Chillicothe conducted no additional training to prevent future uses of force against restrained, subdued, and unresisting individuals.

36. Defendant Moore also has a history of using excessive force against restrained, subdued, and unresisting individuals. On June 27, 2015, when Defendant Moore was employed as a Pickaway County Sheriff's Deputy, he was investigated for his role in holding onto the arm of a handcuffed arrestee as another deputy conducted a "front leg sweep" that foreseeably caused the arrestee to fall, striking his head and shoulder against a brick cell wall. Defendant Moore and another deputy then climbed on top of the handcuffed arrestee.

37. Upon information and belief, Defendant Moore has a history of involvement in other incidents of excessive force.

38. Although the Chillicothe Police Department leadership had full knowledge of Defendant Moore's history of excessive force, Defendant City of Chillicothe conducted no additional training to prevent future uses of force against restrained, subdued, and unresisting individuals.

39. Defendant City of Chillicothe's inadequate training was deliberately indifferent and proximately caused damages to Jayce.

### Defendant City of Chillicothe Had a Custom, Pattern, and Practice of Similar Unconstitutional Misconduct

40. Before May 14, 2024, Defendant City of Chillicothe police officers had engaged in prior incidents of excessive force, showing that Defendant Chillicothe had a custom, pattern, and practice of excessive force.

41. These prior incidents include the prior uses of excessive force by Defendants Conley and Moore referenced above.

42. These prior incidents also include Chillicothe police officers' use of excessive force against an arrestee's 10 year-old child, whom Officers Samatha Taczak and Katrina Hallam shoved into a television stand, and Chillicothe police officers' use of excessive force against a disabled arrestee, Barry Maxwell, as they restrained him prone on the ground.

43. Upon information and belief, Defendant City of Chillicothe's custom of tolerating its officers' use of excessive force in violation of the Fourth Amendment demonstrates a custom, pattern, and practice sufficient to impose municipal liability under 42 U.S.C. § 1983.

### Defendant City of Chillicothe Ratified the Unconstitutional Conduct of Chillicothe Police Department Officers

44. Upon information and belief, Defendant City of Chillicothe investigated its officers' prior uses of force as described above but determined that its officers had done nothing wrong and did not discipline its officers.

45. By failing to hold its police officers accountable for using excessive force, Defendant City of Chillicothe ratified its officers' unconstitutional conduct. This ratification enabled and emboldened Chillicothe police officers to continue using excessive force against arrestees and others.

### Jayce Wingo's Damages

46. As a direct and proximate result of Defendants' use of excessive force against Jayce when he was restrained, subdued, and unresisting, Jayce sustained serious bodily injuries,

including a moderate traumatic brain injury, post-concussive syndrome, and involuntary myoclonus jerking in his arms, legs, head, and abdomen.

47. Jayce's head injuries quickly produced symptoms of severe headaches, upper body twitching and tremors, weakness of the lower extremities, and gait abnormality. The effects of these injuries on Jayce's daily functioning were severe: Jayce was unable to walk properly, had to attend physical therapy, and even used a cane for a period of time.

48. As a direct and proximate result of Defendants' use of excessive force against Jayce, Jayce sustained mental and emotional pain and suffering as well as post-traumatic stress disorder.

49. Defendants' use of excessive force against Jayce will more likely than not cause Jayce future lost earnings and reduced earning capacity. Upon information and belief, Jayce's moderate traumatic brain injury will more likely than not limit his future educational and employment prospects because of impairments to his cognitive and physical functioning.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 and U.S. Constitution Fourth Amendment – Excessive Force Claim Against Defendants Moore, Conley, and Rush**

50. Plaintiff incorporates by reference all foregoing factual allegations as if fully restated herein.

51. Defendants Moore, Conley, and Rush acted under color of state law to deprive Jayce Wingo of his rights, privileges, and immunities secured by the Fourth Amendment to the U.S. Constitution as an arrestee, including but not limited to the right to be free from the use of unreasonable and excessive force to effectuate an arrest.

52. The law does not permit law enforcement officers to use force against a restrained, subdued, and unresisting subject to effectuate an arrest.

53. By continuing to use force against Jayce Wingo after he had ceased resisting and was both restrained and subdued, Defendants Moore, Conley, and Rush violated clearly established Fourth Amendment law.

54. The unreasonable use of excessive force by Defendants Moore, Conley, and Rush directly and proximately caused damages to Jayce Wingo, including serious physical injuries, medical expenses, pain and suffering, and future lost wages. Defendants are jointly and severally liable for these damages.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 and U.S. Constitution Fourth Amendment – *Monell* Claim
### Against Defendant City of Chillicothe

55. Plaintiff incorporates by reference all foregoing factual allegations as if fully restated herein.

56. The actions of Defendants Moore and Conley, as alleged above, were taken pursuant to one or more interrelated *de facto* policies, customs, patterns, and/or practices of civil rights violations and unconstitutional practices of Defendant City of Chillicothe. These *de facto* policies, customs, patterns, and/or practices were thus a moving force behind Moore's and Conley's violation of Jayce Wingo's constitutional rights.

57. Defendant City of Chillicothe approved, authorized, and acquiesced in the unlawful and unconstitutional conduct of its employees and/or agents, including Defendants Moore and Conley, and is consequently liable for those, pursuant to 42 U.S.C. § 1983.

58. Defendant City of Chillicothe is required to ensure that the policies, practices, and customs of its Police Department comply with federal and Ohio law concerning the treatment of arrestees, detainees, and members of the public. City of Chillicothe failed to fulfill this responsibility.

59. Defendant City of Chillicothe failed to properly train Defendants Moore and Conley as well as other officers regarding constitutional prohibitions upon using force against restrained, subdued, and unresisting individuals. This includes the constitutional requirement that officers must cease using force when a subject stops resisting. It was so obvious that officers would encounter such scenarios in their regular duties that the failure to provide adequate training was deliberately indifferent.

60. Defendant City of Chillicothe failed to properly train Defendants Moore and Conley as well as other officers regarding constitutional prohibitions upon using force against arrestees for retaliatory motives. It was so obvious that officers would encounter such scenarios in their regular duties that the failure to provide adequate training was deliberately indifferent.

61. Defendant City of Chillicothe ratified the unconstitutional actions of its police officers, including but not limited to the officer Defendants to this matter, in using excessive force against arrestees, including restrained, subdued, and unresisting arrestees and including using force with retaliatory motives. This ratification enabled and emboldened the constitutional violations alleged herein.

62. Defendant City of Chillicothe's unconstitutional customs, patterns, and practices, together with its inadequate training, directly and proximately caused damages to Jayce Wingo.

### THIRD CLAIM FOR RELIEF
### Willful, Wanton, or Reckless Breach of Duty
### Against Defendants Moore, Conley, and Rush

63. Plaintiff incorporates by reference all foregoing factual allegations as if fully restated herein.

64. Defendants Moore, Conley, and Rush had a duty to the public at large, including to Jayce Wingo, to exercise due care, to act in a lawful and reasonable manner, and not to act in a manner that was willful, wanton, or reckless.

65. Additionally, as law enforcement officers, Defendants Moore, Conley, and Rush had a duty to protect citizens, including Jayce Wingo.

66. Defendants Moore, Conley, and Rush intentionally failed to act when they each had a duty to act.

67. The breach of duty by Defendants Moore, Conley, and Rush was the direct and proximate cause of Jayce Wingo's serious injuries and damages.

68. A reasonable person in the position of Defendants Moore, Conley, and Rush would have recognized that his conduct created an unreasonable risk of physical harm to Jayce Wingo (and the public). This risk was substantially greater than that which would have made his conduct negligent.

69. At all times relevant herein, Defendants Moore, Conley, and Rush each knew or should have known that his conduct would or could cause serious physical injury to Jayce Wingo but he disregarded that knowledge.

70. In the manner described more fully above, Defendants Moore, Conley, and Rush each breached those duties when he failed to exercise due care, failed to protect Jayce Wingo, and acted in a reckless and/or willful and/or wanton manner.

71. Because Defendants Moore, Conley, and Rush each breached these duties of care in a manner that was reckless and/or willful and/or wanton, none is not entitled to the immunities set forth in Ohio R.C. § 2744.01 *et seq*.

72. As a direct and proximate result of this reckless misconduct by Defendants Moore, Conley, and Rush, Jayce Wingo suffered injuries and damages prior to his death, including serious mental anguish and severe conscious physical pain and suffering, for which he seeks compensation. Defendants are jointly and severally liable for these damages.

**FOURTH CLAIM FOR RELIEF**
**Ohio Law Assault and Battery**
**Against Defendants Moore, Conley, and Rush**

73. Plaintiff incorporates by reference all foregoing factual allegations as if fully restated herein.

74. The actions of Defendant Moore in forcing Jayce Wingo's head onto the ground at least twice created in Jayce the apprehension of an imminent, harmful, and offensive touching and constituted a harmful touching, knowingly and without legal justification.

75. Defendant Moore's actions were intentional.

76. In the manner described more fully above, Defendant Moore acted in a reckless and/or willful and/or wanton manner.

77. The actions of Defendant Conley in punching Jayce Wingo after he was restrained and unresisting on the ground created in Jayce the apprehension of an imminent, harmful, and offensive touching and constituted a harmful touching, knowingly and without legal justification.

78. Defendant Conley's actions were intentional.

79. In the manner described more fully above, Defendant Conley acted in a reckless and/or willful and/or wanton manner.

80. The actions of Defendant Rush in punching Jayce Wingo after he was restrained and unresisting on the ground created in Jayce the apprehension of an imminent, harmful, and offensive touching and constituted a harmful touching, knowingly and without legal justification.

81. Defendant Rush's actions were intentional.

82. In the manner described more fully above, Defendant Rush acted in a reckless and/or willful and/or wanton manner.

83. Because Defendants Moore, Conley, and Rush each breached his duties in a manner that was reckless and/or willful and/or wanton, none is not entitled to the immunities set forth in Ohio R.C. § 2744.01 *et seq.*

84. As a direct and proximate result of the misconduct by Defendants Moore, Conley, and Rush, Jayce Wingo suffered serious injuries and damages for which he seeks compensation. Defendants are jointly and severally liable for these damages.

### FIFTH CLAIM FOR RELIEF
**Ohio R.C. §§ 2307.60 and 2921.44 – Civil Liability for Criminal Acts: Dereliction of Duty Against Defendants Moore, Conley, and Rush**

85. Plaintiff incorporates by reference all foregoing factual allegations as if fully restated herein.

86. Defendants Moore, Conley, and Rush recklessly failed to perform duties imposed by law, including the duty to keep the peace and protect members of the public, which includes Jayce Wingo

87. Defendants Moore, Conley, and Rush recklessly acted in a manner forbidden by law. They are not entitled to the immunities set forth in Ohio R.C. § 2744.01 *et seq.*

88. By these criminal acts, Defendants Moore, Conley, and Rush directly and proximately caused damages to Jayce Wingo. Defendants are jointly and severally liable for these damages.

## SIXTH CLAIM FOR RELIEF

### Ohio R.C. §§ 2307.60 and 2921.45 – Civil Liability for Criminal Acts: Interfering with Civil Rights

### Against Defendants Moore, Conley, and Rush

89. Plaintiff incorporates by reference all foregoing factual allegations as if fully restated herein.

90. Defendants Moore, Conley, and Rush acted under color of his office as a public servant to knowingly deprive Jayce Wingo of his rights under the United States and Ohio Constitutions to be free from the unreasonable seizure using excessive force. U.S. Const., Amend. IV; Ohio Const. Art. I, § 14.

91. Defendants Moore, Conley, and Rush recklessly acted in a manner forbidden by law. They are not entitled to the immunities set forth in Ohio R.C. § 2744.01 *et seq.*

92. By their criminal acts, Defendants Moore, Conley, and Rush directly and proximately caused damages to Jayce Wingo. Defendants are jointly and severally liable for these damages.

## JURY DEMAND

93. Plaintiff demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A. Award Plaintiff compensatory damages in an amount to be shown at trial;

B. Award punitive damages against all Defendants in an amount to be shown at trial;

C. Award Plaintiff reasonable attorney's fees, costs, and disbursements;

D. Award Plaintiff pre and post judgment interest;

E. Grant Plaintiff such additional relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Sarah Gelsomino*
Sarah Gelsomino (0084340)
FRIEDMAN, GILBERT + GERHARDSTEIN
50 Public Square, Suite 1900
Cleveland, OH 44113-2205
T: 216-241-1430
F: 216-621-0427
sarah@FGGfirm.com

Jacqueline Greene (0092733)
Elijah Hack (0099633)
FRIEDMAN GILBERT + GERHARDSTEIN
35 East 7th Street, Suite 201
Cincinnati, Ohio 45202
T: 513-572-4200
F: 216-621-0427
jacqueline@FGGfirm.com
elijah@FGGfirm.com


*/s/ Nathan J. Stuckey*
Nathan J. Stuckey (0086789)
J. Michael Vervoort (0097832)
**THE STUCKEY FIRM, LLC**
49 E. College Ave., Suite 300
Springfield, Ohio 45504
P: (937)346-8000
F: (937)717-0070
nstuckey@legalspringfield.com
mvervoort@legalspringfield.com


*Counsel for Plaintiff Jayce Wingo*